UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- x
DALIA GENGER,                                           :
                            Plaintiff,                  :
                  v.                                    :    Index No. 1:17cv8181
                                                        :
SAGI GENGER,                                            :
                  Defendant/Third-Party Plaintiff,      :
                  v.                                    :
                                                        :
ORLY GENGER,                                            :
                  Third-Party Defendant.                :
                                                        :
----------------------------------------------------------------------- x


**JUDGMENT CREDITOR SAGI GENGER'S MEMORANDUM
OF LAW IN SUPPORT OF HIS MOTION FOR TURNOVER
OF PROMISSORY NOTES AND FUNDS FROM GARNISHEES
AND RESCISSION OF FRAUDULENT CONVEYANCE**


KELLEY DRYE & WARREN LLP
John Dellaportas
101 Park Avenue
New York, New York 10178
(212) 808-7800
*Attorneys for Defendant/Third-Party*
*Plaintiff and Judgment Creditor Sagi Genger*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

THE FRAUDULENT CONVEYANCES .....................................................................................6

ARGUMENT....................................................................................................................14

I.      GOVERNING LAW...................................................................................................14

II.     THE FRAUDULENT TRANSFERS .............................................................................17

CONCLUSION..................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. Mattikow,*
  225 F.R.D. 407 (E.D.N.Y. Dec. 16, 2004)................................................................24

*ACLI Government Securities, Inc. v. Rhoades,*
  653 F. Supp. 1388 (S.D.N.Y. 1987)........................................................................23

*Alpert's Newspaper Delivery v. New York Times,*
  876 F.2d 266 (2d Cir. 1989)....................................................................................18

*Arnold v. Walsh (In re Walsh),*
  2006 Bankr. Lexis 5026 (Bankr. W.D.N.Y. 2006) .................................................21

*Beauvais v. Allegiance Sec., Inc.,*
  942 F.2d 838 (2d Cir. 1991)....................................................................................17

*CSX Transp., Inc. v. Island Rail Terminal, Inc.,*
  879 F.3d 462 (2d Cir. 2018)....................................................................................15

*Dussault v. Republic of Argentina,*
  2015 U.S. App. Lexis 17593 (2d Cir. Oct. 5, 2015) .........................................15, 17

*Empire Lighting Fixture Co. v. Practical Lighting Fixture Co.,*
  20 F.2d 295 (2d Cir. 1927)................................................................................14, 16

*Epperson v. Entertainment Express, Inc.,*
  242 F.3d 100 (2d Cir. 2001)....................................................................................14

*In re Fill,*
  82 B.R. 200 (S.D.N.Y. 1987)..............................................................................22, 23

*Gelbard v. Esses,*
  96 A.D.2d 573 (2d Dep't 1983) ..............................................................................15

*Genger v. Genger,*
  121 A.D.3d 270 (1st Dep't 2014) ..............................................................................7

*Genger v. Genger,*
  2018 U.S. Dist. Lexis 126958 (S.D.N.Y. July 27, 2018)................................2, 3, 8

*Genger v. Genger,*
  663 Fed. App'x 44 (2d Cir. Sept. 29, 2016) ......................................................3, 6, 18

*Genger v. Genger,*

76 F. Supp.3d 488 (S.D.N.Y. 2015) ............................................................................... *passim*

*Grace v. Bank Leumi Trust Co. of N.Y.*,
  443 F.3d 180 (2d Cir. 2006) ...................................................................................... 21

*Hassett v. Goetzmann*,
  10 F. Supp.2d 181 (N.D.N.Y. 1998) .............................................................. 22, 23, 24

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ........................................................................................ 20

*In re Jacobs*,
  394 B.R. 646 (Bankr. E.D.N.Y. 2008) ....................................................................... 23

*Kashi v. Gratsos*,
  712 F. Supp. 23 (S.D.N.Y. 1989) ............................................................................... 17

*Kittay v. Korff (In re Palermo)*,
  2011 U.S. Dist. Lexis 99537 (Bankr. S.D.N.Y. Sept. 2, 2011) .......................... 22, 25

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) .................................................................................................. 14

*Marshak v. Green*,
  746 F.2d 927 (2d Cir. 1984) ...................................................................................... 14

*Melwani v. Jain*,
  2004 U.S. Dist. Lexis 16867 (S.D.N.Y. Aug. 24, 2004) ........................................... 18

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
  910 F. Supp. 913 (S.D.N.Y. 1995) ............................................................................ 23

*Mitchell v. Garrison Protective Servs., Inc.*,
  579 F. App'x 18 (2d Cir. 2014) ................................................................................. 21

*Mitchell v. Lyons Prof'l Servs., Inc.*,
  109 F. Supp.3d 555, 563 (E.D.N.Y.), *aff'd* 819 F.3d 636 (2d Cir. 2016) ................ 16

*Perrone v. Amato*,
  2010 U.S. Dist. Lexis 148202 (E.D.N.Y. Aug. 30, 2010) ......................................... 23

*Peterson v. Islamic Republic of Iran*,
  876 F.3d 63 (2d Cir. 2017) ........................................................................................ 16

*Ruiz v. Comm'r of the Dep't of Transp.*,
  858 F.2d 898 (2d Cir. 1988) ...................................................................................... 18

*Salomon v. Kaiser (In re Kaiser)*,
  722 F.2d 1574 (2d Cir. 1983) .............................................................................. 22, 23

*Schwartz v. A. J. Armstrong Co.*,
    179 F.2d 766 (2d Cir. 1950)................................................................16

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005).................................................................24

*Peacock v. Thomas*,
    516 U.S. 349, 354 (1996)...................................................................14

*Souffront v. La Compagnie Des Sucreries De Porto Rico*,
    217 U.S. 475 (1910)...........................................................................18

*Tae H. Kim v. Ji Sung Yoo*,
    311 F. Supp.3d 598, 622 (S.D.N.Y. 2018)........................................25

*TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*,
    2014 U.S. Dist. Lexis 67116 (S.D.N.Y. May 15, 2014) ......................7

*TR Investors, LLC v. Genger*,
    2013 Del. Ch. Lexis 48 (Del. Ch. Feb. 18, 2013) ...............................8

*In re Wallace v. Kotowski (In re Dziadosz)*,
    1997 Bankr. Lexis 2362 (Bankr. W.D.N.Y. June 23, 1997)...............21

**Statutes, Rules and Other Authorities**

CPLR 5201................................................................................... 14-15

CPLR 5205.......................................................................................15

CPLR 5206.......................................................................................16

CPLR 5225.................................................................................. *passim*

CPLR 5227.............................................................................1, 15, 16

DCL 272...................................................................................1, 20

DCL 273...................................................................................1, 16

DCL 273-a ..............................................................................1, 16

DCL 275...................................................................................1, 17, 20

DCL 276.................................................................................. *passim*

DCL 276-a ..............................................................................1, 24, 25

Defendant/third-party plaintiff and judgment creditor Sagi Genger ("Sagi") respectfully submits this memorandum of law in support of his motion for an order: (a) pursuant to CPLR 5225(b) and 5227, and Fed. R. Civ. P. 69, compelling garnishees/transferees Michael Bowen, Arie Genger ("Arie") and Tedco, Inc. (together with its control persons and intermediaries) to turn over to the U.S. Marshal all promissory notes and funds in which third-party defendant and judgment debtor Orly Genger ("Orly") has an interest sufficient to satisfy Sagi's judgment; (b) pursuant to DCL 273, 273-a, 275, 276, 278, rescinding all fraudulent conveyances associated therewith; and (c) pursuant to DCL 276-a, awarding Sagi his reasonable attorney's fees and disbursements.

## **<u>INTRODUCTION</u>**

On August 17, 2018, this Court entered judgement (the "Judgment") in Sagi's favor "in the amount of $3,000,000 in base damages, plus statutory interest in the amount of $219,698 pursuant to CPLR Article 50 at 9% per annum from October 24, 2017 through entry of this Judgment, plus 50% of Sagi's reasonable counsel and other professional fees, expenses and costs in connection with this action …." Doc. 112. Orly did not pay the Judgment. Instead, she filed a declaration with this Court claiming insolvency: "I do not have the money to pay the amounts demanded by Dalia and Sagi, and they know this. In the event the judgment in this action is upheld, it is almost a certainty I will have to file for bankruptcy protection …" Doc. 123.

By outward appearance, Orly would appear to be one of the more fortunate members of our society. She and her husband live in a string of multi-million dollar homes. Doc. 80-13, 80-17, 94-1. Her husband is a senior Biglaw partner at a firm with average profits per equity partner of over $2 million per year. https://bit.ly/2HVNnDb. At his prior job, he won an executive severance package of $50 million and use of a corporate jet. Doc. 38-10. His exotic car collection includes, *inter alia*, a Rolls Royce, Bentley and Lamborghini. Doc. 80-4.

Even prior to her marriage, Orly had significant assets. As this Court found, Orly settled

state court litigation claims in 2013 against parties known as the "Trump Group," whereby "Orly monetized her beneficial interest in the [family business] TRI shares for $32.3 million." *Genger I*, 76 F. Supp.3d at 501. "Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement." *Id.* at 499. "The $32.3 million consists of $17.3 million in cash up front, plus two additional $7.5 million [promissory notes] to be made over four years." *Id.* at 494 n.11. The two $7.5 million notes remain outstanding. Exh. N at 9:10-17.

From the moment she procured this largesse, Orly knew that this was not "free money." Rather, it came encumbered by a commitment she had made to her mother Dalia Genger nine years earlier, that if the TRI shares ever returned an economic benefit, Dalia would be able to claw back some of the gain to support her retirement. The parties structured their agreement such that Dalia would first demand financial support from her son Sagi for up to a fixed amount—later calculated by this Court to be $24.7 million (*Genger III*, 2018 U.S. Dist. Lexis 126958, *17 n.5) —and Sagi would then have the right to seek indemnity from Orly for 50% thereof.

Instead of honoring this commitment, Orly, in collaboration with her father Arie Genger (who is divorced from Dalia) and her attorney/husband Eric Herschmann, set about on a scheme to frustrate that financial obligation and deny Dalia any support. When the first $17.3 million payment was made in 2013, Orly directed her then-attorney, William Wachtel, to immediately wire the entire sum to a trust established for the benefit of <u>Arie's</u> creditors (not hers). Because, however, the remaining $15 million had not yet come due, they had to be more creative. Together, they hatched a scheme to encumber those two promissory notes by having Orly pledge them as "security" to her husband and father for patently bogus "liabilities." They then fought tooth-and-nail to keep this scheme hidden as long as possible. Enough is now known, however, to bring this turnover and fraudulent conveyance proceeding to enforce the judgment.

## BACKGROUND[1]

The Genger family consists of father Arie, mother Dalia, son Sagi, and daughter Orly, all adults.  In 2004, Arie and Dalia divorced.  In the divorce, Dalia agreed to convey her marital rights to 794.40 shares of a Genger family business called Trans-Resources, Inc. ("TRI") to two trusts benefiting Orly and Sagi, respectively, in exchange for the children's commitment to financially support her, should she request it.  *Genger I*, 76 F. Supp.3d at 491-92.

This arrangement was effectuated through three agreements.  First, Dalia and Arie executed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which stipulation was fully executed on October 30, 2004.  In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in 794.40 shares of TRI to Orly's and Sagi's trusts.  Second, Dalia and Sagi executed a letter agreement dated October 30, 2004 (the "2004 Promise").  In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand.  The 2004 Promise states that the agreement is made in consideration of the fact that: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial interests in those shares, by trusts for [their] benefit."  This, Orly and Sagi executed a letter agreement dated November 10, 2004 (the "2004 Indemnity").  In the 2004 Indemnity, Orly agreed to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations … which arise from [Sagi's] undertakings in the [2004 Promise]."  *Genger I*, 76 F. Supp.3d at 492-93.

---

[1]     These facts are mostly drawn from the Court's summary judgment findings in *Genger v. Genger*, 76 F. Supp.3d 488 (S.D.N.Y. 2015) ("*Genger I*"), which the Second Circuit unanimously affirmed in *Genger v. Genger*, 663 Fed. App'x 44 (2d Cir. Sept. 29, 2016) ("*Genger II*"), and in this case, *Genger v. Genger*, 2018 U.S. Dist. Lexis 126958 (S.D.N.Y. July 27, 2018) ("*Genger III*").  Docket entries from this case are cited herein as "Doc. __." The remaining facts can be found in the exhibits to the accompanying declaration of John Dellaportas, each cited herein as "Exh. __."

In August 2008, Sagi's trust and a Sagi-run entity called "TPR" entered into an agreement with the Trump Group to sell their rights in his trust's shares of TRI to the Trump Group for $26.7 million.  TPR also settled its claim to record ownership of the TRI shares claimed by Orly's Trust for approximately $10.3 million. *Genger I*, 76 F. Supp.3d at 493.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her trust's claim to beneficial ownership of the TRI shares.  The 2013 Settlement Agreement provided that the Trump Group would pay $32.3 million and, in exchange, Orly, Arie, and Arie's two litigation funders (Arnold and David Broser)—the four defined therein, collectively, as the "AG Group"—would provide the Trump Group with, *inter alia*, (a) a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and (b) Orly's waiver of all of her claims to the TRI shares, both as a trust beneficiary and individually. *Genger I*, 76 F. Supp.3d at 493-94.  As Orly later told the U.S. Court of Appeals for the Second Circuit, the Agreement provides "that the Trump Group would pay $32 million to the AG Group in exchange for a release of any ownership interest in the TRI shares." Case 15-350, Doc. 93 p. 14.

In January 2014, Dalia requested $200,000 from Sagi under the 2004 Promise.  Sagi paid. He then requested $100,000 from Orly under the 2004 Indemnity. Orly refused to pay.  On February 18, 2014, Sagi sued Orly for breach of contract. Case 1:14-cv-1006, Doc. 1.  Orly moved to dismiss, arguing that: "**This lawsuit is nothing more than Sagi and Dalia's latest attack upon Orly — which they hope to culminate in a future demand that Orly pay Sagi $6.5 million in purported indemnification.**" *Id.*, Doc. 11 p. 2 (emphasis added).  In her reply, Orly reiterated that "Sagi and Dalia now assert Orly still must potentially pay Dalia/Sagi … **an amount reaching several millions of dollars**." *Id.*, Doc. 39 p. 1 (emphasis added).

On July 22, 2014, the Court dismissed Sagi's complaint on jurisdictional grounds. Case

1:14-cv-1006, Doc. 52.  Two days later, Sagi filed a new action against Orly which cured the jurisdictional defect. Case 1:14-cv-05683, Doc. 1.  Orly again moved to dismiss, again arguing that: "**this lawsuit is nothing more than Sagi and Dalia's latest attack upon Orly — which they hope to culminate in a future demand that Orly pay Sagi $6.5 ….**" (*Id.*, Doc. 12 p. 21.) The Court denied the motion, and the case proceeded on the merits.

At the initial case conference in that case, Orly's counsel claimed the 2004 Indemnity was a "forgery." *Genger I*, 76 F. Supp.3d at 493.  After a handwriting analysis and contemporaneous correspondence proved the signature to be hers, Orly dropped her "forgery" defense, and no longer denied that she had executed the 2004 Indemnity.  Instead, she argued that the 2004 Indemnity was void for lack of consideration because, supposedly, "only Sagi benefited" from Dalia's TRI shares; "Orly and the Orly Trust have … none of the proceeds"; "Sagi … obtain[ed] all the value – and Orly none." Case 1:14-cv-1006, Doc. 38, pp. 1, 3, 18.  Faced with these arguments, the Court ordered Orly to produce the aforementioned 2013 Settlement Agreement.  Orly moved for reconsideration, and for a stay pending an emergency appeal she filed with the Second Circuit. All of these were denied, and the document was produced.  *Id.*, Doc. 64. 76.

The 2013 Agreement belied pretty much every representation Orly had made to the Court until that point, but Orly forged ahead.  On summary judgment, she again argued that her potential liability was much higher than meets the eye: "This case is an attempt to push the camel's nose under the tent flaps. … Today's request for $200,000 is only the beginning: **their next request will be for millions**." Case 1:14-cv-1006, Doc. 92 p. 1 (emphasis added).

The Court did not find this argument relevant, and instead granted summary judgment for Sagi.  In doing so, the Court held that: "Orly … denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration. But, **as it turns out, Orly has**

effectively monetized an interest in the very shares *she claims not to have received* **to the tune of $32.3 million**." *Genger I*, 76 F. Supp.3d at 491.  In a later fee award, the Court further held that: "this action differs from the usual scenario in that **the contract at issue imposes continuing obligations on the parties, such that its true economic impact on the parties is likely to greatly exceed the exact amount of damages sued over**. The stakes in this case are in fact higher than first meets the eye." Case 1:14-cv-1006, Doc. 112 p. 6 (emphasis added).

Orly appealed, and also filed a Rule 60(b) motion to vacate the judgment.  This Court denied the latter, upon which Orly appealed that denial as well.  Orly's two appeals were then consolidated and argued together.  On appeal, Orly again claimed that she did not benefit from the 2013 Settlement Agreement, and thus consideration was lacking.  The Second Circuit disagreed. By Summary Order dated September 29, 2016, the Court of Appeals unanimously affirmed each of this Court's rulings.  In so doing, the Court of Appeals deemed it irrelevant whether Orly personally pocketed any of the "$32 million [received] in exchange for relinquishing all rights to the shares she received as part of the Divorce Stipulation." *Genger II*, 663 Fed. Appx. at 49.  "Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie, or to pay debts owed to her litigation partners." *Id.* at 49-50.

## THE FRAUDULENT CONVEYANCES

The Second Circuit's affirmance in *Genger II* crystallized what Orly had been portending in her case filings since 2014—a multi-million dollar liability to Sagi.  And indeed, last August this Court entered a $3.2 million judgment in Sagi's favor in this action, Case 1:17-cv-08181.  As the Court held: "Based on the prior rulings of this Court in *Genger I* (and the Second Circuit's subsequent affirmance in *Genger II*), [it] has been conclusively established that: (1) the 2004 Integrated Agreement is valid and enforceable; (2) Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million, a substantial portion of which was

attributable to Dalia's conveyed marital interest; and (3) … Dalia is entitled to demand payment up to a certain amount in her "sole and absolute discretion." Doc. 112.

Although it has been "conclusively established" that Orly monetized her interest in the TRI shares for $32.3 million, she and her legal team have fought tooth and nail in post-judgment discovery to conceal from Sagi Orly's arrangements with respect to that $32.3 million. When asked in interrogatories to "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person or entity pursuant to Defendant's 2013 settlement," Orly falsely swore, under oath, that she had "no knowledge." Exh. B pp. 16-17.  Meanwhile, the Kasowitz firm (whose partner Mr. Bowen is the current escrow agent under the 2013 Settlement Agreement) falsely testified at deposition that: "We don't have any information about any agreements" concerning payments yet to come due under the Agreement. Exh. H at 32:23-25.

Slowly, following a series of discovery rulings, the truth has come out.  Orly, in cahoots with her husband and father, has spent recent years scheming to shield the $32.3 million she monetized under the 2013 Settlement Agreement, and her other assets, from collection, and thus frustrate the multi-million judgment she long knew would be coming.

As noted above, the $32.3 million comes in two parts: (a) $17.3 million cash paid up front, and (b) two additional $7.5 million promissory notes to be paid later.[2]  Exh. A pp. 2-3.  Under the 2013 Settlement Agreement, the Trump Group agreed to pay $32.3 million to an escrow agent (William Wachtel, Orly's counsel of record) without allocating that sum amongst the four counterparties to the Agreement, defined Orly, Arie, and the Brosers. *Id.* at 1.

---

[2]       Paragraphs 2-3 of the 2013 Settlement Agreement describes $50 million of consideration; however, that sum includes the Trump Group's release of claims to escrow accounts of $10.3 million and $7.4 million, respectively.  Following rulings by District Judge Keenan of this Court and Judge Helen E. Freedman of the Appellate Division, First Department, the escrow accounts were ultimately held to belong to an entity run by Sagi. *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, 2014 U.S. Dist. Lexis 67116 (S.D.N.Y. May 15, 2014); *Genger v. Genger*, 121 A.D.3d 270 (1st Dep't 2014).  That left $32.3 million in actual cash consideration.

As this Court found, it was Orly and only Orly who monetized her beneficial interest in her trust's shares for $32.3 million. Her co-parties to the 2013 Settlement Agreement, Arie and the Brosers, had no live claims to monetize. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Exh. R. (The Trump Group had earlier impleaded the Brosers into the state court suit as third party defendants, claiming that the Brosers' litigation funding of Arie's suit constituted illicit champerty and maintenance under New York law. Exh. I.)

As for Arie, by the time the Settlement Agreement was signed, the Delaware Chancery Court had already extinguished his own claim to ownership of the TRI shares, and threatened to hold him in contempt if he did not immediately withdraw his duplicative New York claims against the Trump Group. *TR Investors, LLC v. Genger*, 2013 Del. Ch. Lexis 48, **91-94 (Del. Ch. Feb. 18, 2013). Right after that Delaware ruling came down, Mr. Wachtel called the Trump Group's counsel on behalf of both Gengers to ask for settlement negotiations. Exh. N at 39:4-18. A few months later, the 2013 Settlement Agreement was signed. Exh. A.

In sum, the Court correctly attributed all $32.3 million to Orly's monetization of the TRI shares. When she signed the Agreement, Orly knew that, as a consequence thereof, Dalia would have a claim under the 2004 Promise and Indemnity for a portion of the proceeds. As this Court later found: "Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value [to Sagi and Orly])." *Genger III*, 2018 U.S. Dist. Lexis 126958, *17 n.5.

Yet Orly did not set aside any of the $32.3 million to help financially support her mother, as she had promised to do in 2004, despite knowing that any TRI monetization came with that encumbrance. In the intervening years, Orly had grown estranged from her mother, and was suing

Dalia (always unsuccessfully) in multiple forums. So instead of honoring her commitment, Orly diverted all $17.3 million to pay her father's creditors.

The 2013 Settlement Agreement was executed on June 16, 2013.  On July 1, 2013, the Trump Group made the first $17.3 million payment thereunder.  Within two days, the money had traveled through five accounts.  It started in the account of a Trump Group entity called "TI Capital Corp.," was then wired to the client IOLA account of Wachtel Missry LLP (the firm representing Orly in the underlying suit), was then wired to an account at Northern Trust Bank in the name of the "Genger Litigation Trust" (a trust co-created by Orly and Arie and naming another of Orly's lawyers, Lance Harris, and David Broser as co-trustees), was then wired to an account at Goldman Sachs in the name of "ADBG LLC" (the Broser entity designated as lender in the parties' Credit Agreement), and finally all but $1 million of it ended up in an account at Credit Suisse in the name of "Tedco" (another entity owned by the Broser family). Exh. Y.

There can be no dispute that the Brosers understood they were being paid from money that did not belong to their borrower (Arie), but rather to a third party (Orly) who owed them nothing. Exh. D at 36:9-10.  As this Court twice found, Orly had generated that money by monetizing her own trust's interest in the TRI shares.  The Brosers were both named as third-party defendants in the underlying suit (Exh. I), so they knew exactly what the lawsuit was about.  Yet when informed of this unpaid judgment, and Orly's claimed insolvency, the Brosers did not offer to return any of Orly's money to her, but instead fought discovery at every turn, requiring multiple interventions by this Court for Sagi to learn the truth. Exhs. C, D at 19:16-32:15.

The above transfers still left two $7.5 million promissory notes to be paid under the 2013 Settlement Agreement.  Orly could not dissipate those funds, because they were not yet payable (to date, certain preconditions have not yet been met).  So Orly, her father and her husband devised a plan to frustrate the upcoming judgment by encumbering the notes with bogus liabilities.  This

was quite purposeful. ███████████████████████████████████████████

█████████████████████████████████████████████

      █            ████████████████████████

      █            ████████████████████████

      █            ███████████████████████████████████████
                   █████████████████████████

      █            ███████████████████████████████████████
                   ████████████████████████

Exh. X at 79:12-80:7 (emphasis added).

Orly appears to have hatched her plan shortly after the Court awarded summary judgment to Sagi on January 5, 2015, and accelerated it after the Second Circuit affirmed the enforceability of the 2004 Indemnity on September 29, 2016.  Key to her plan were three documents, each of which she concealed until the Court ordered them produced (and one which of she kept hidden even after the Court ordered it produced (Doc. 209)): (a) a ████████ secured promissory note dated December 31, 2016, in favor of her father, Arie; (b) a ████████ secured promissory note dated December 30, 2016 in favor of her husband, Eric Herschmann; and (c) an agreement dated March 31, 2017 (the "2017 Agreement") █████████████████████████████████████

████████████████████████. Exhs. T, U, V.

With respect to these two promissory notes, Sagi has three initial observations.  First, ████████████████████████████████████████████████████████████████████

████████████████████████████Exhs. AA, BB.  Second, ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████Exh. X at 109:15-17; 139:11-15.  Third, ████████████

████████████████████████*Id.* at 116:16-22.  Together, these documents are a sham designed to frustrate Sagi's judgment.  We examine each one in turn.

The ████████████ promissory note to Arie (Exh. T) supposedly represents sums Arie has

advanced Orly for legal fees.  As the story goes, Arie paid Orly's lawyers directly for her various

suits, using some of the $17.3 million he borrowed from the Brosers.  One of those suits was the

state court action that ultimately led to Orly's $32.3 million settlement.  But incredibly, when Arie

repaid the Brosers using Orly's settlement funds, ████████████████████████(Exh. W),

he did not extinguish Orly's supposed debt to him.  In reality, the whole story was cooked up after

the fact and applied retroactively as an asset protection scheme.  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Exh. AA.  The UCC

liens based on the note was not filed until August of last year. Exh. J.  ███████████████

████████████████████████████████████████████████████████

████████████████ Exhs. X at 141:3-10; EE at 69:20-70:17, O pp. 11-23.

Orly's ████████ promissory to her husband, Eric Herschmann (Exh. U), is no better. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ However, the

lion's share of Kasowitz's legal work on her behalf was in a state court.  In March 2015, Mr.

Herschmann told that court that: "I have a retainer letter that would reflect that all of the attorneys

that are on the trial for Kasowitz are working pro bono."  Exh. M.  That was not merely a moment

of careless braggadocio.  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Exh. Z p. 27.

████████████████████████████████████████████████████

████████ (Mr. Herschmann has moved to quash Sagi's subpoena for documents and testimony,

which would get to the bottom of the matter.)  Even if the payment were for Kasowitz's "pro bono"

-11-

legal work on Orly's behalf, this would simply have been an example of a wealthy spouse paying his less-wealthy spouse's bills.  When Orly's legal fortunes soured, however, the payment was retroactively recharacterized as a "secured loan," and a promissory note was created and backdated to conform to that story.  While it is unclear when the "December 30, 2016" note was actually signed, ██████████████████████████████ and the UCC liens reflecting the note were not filed until May 10, 2017 (a few days after a New York JHO rejected Orly's $85 million damages claim against Sagi in another case). Exhs. BB, K.

Lastly, there is a March 31, 2017 agreement tying it all together. Exh. V.



If the Trump Group's $3 million indemnity claim is also treated as an offset (Exh. N at 66:9-15), that would leave nothing to pay Sagi's judgment.  Indeed, that is exactly the intent of this scheme.

According to her deposition testimony and her AmEx Black Card statements (which Orly and her husband concealed, in violation of multiple Court orders (Doc. 202, 206)), Orly is financially supported, to the tune of hundreds of thousands of dollars per year, by her husband. The effect of the above scheme is to "round trip" the money out of Orly's control and then back to her through her husband.  The way it works is as follows: Orly pledged all of her assets to her husband. Exh. K.  To the extent the former was not enough to eat through all of the money coming her way, she then also pledged all of her assets to her father Arie, who in turn pledged all of *his* assets back to Mr. Herschmann. Exh. J.  (████████████████████████████ ████████████████████████ Exh. U.)

Apparently not wanting to leave any loose ends, with the $15 million dissipated, Orly set

about transferring away her remaining assets as well. ████████████████████ ███████████████████████████████████████████████████ Exh. DD at 35:4-23.  Last August, after summary judgment was rendered in Sagi's favor, Orly emptied out all of her U.S. investment and bank accounts and hurriedly wired all the money to her attorney's IOLA account, thereby obscuring the ultimate recipient account. Exh. P.

On September 20, 2018 (three weeks after judgment was entered in this case), Orly recorded a transfer of her controlling interest in her well-established art business, Everything Important LLC, to her father for no cash consideration. Exh. Q.  And finally on September 28, 2018 (one week after Sagi domesticated his judgment in Travis County, Texas), Orly recorded a "Deed of Trust" in that same county purporting to transfer her residual rights to her 50% interest in the couple's property – a multi-million dollar apartment in the W Hotel in downtown Austin[3] – to a trust for the benefit of her husband, Mr. Herschmann. Exh. G.

Each of the foregoing transactions is a fraudulent conveyance under New York Debtor and Creditor Law.  For purposes of the instant motion, however, Sagi seeks to set aside only: (a) the $17.3 million cash transfer to Arie, the Brosers and their entity, Tedco, Inc. (and, to the extent necessary, the intermediary entities through which the money passed); and (b) the encumbrances placed on the two $7.5 million promissory notes by Orly's husband and father.  The promissory notes are currently held by Mr. Herschmann's law partner, Michael Bowen (Exh. H 35:5-25), so he, along with the above-named persons/entities, are being served with this motion.  Sagi also seeks an award of reasonable attorney's fees and disbursements.

---

[3]  Orly has declared the property her "homestead" in Texas despite claiming to this Court that she resides full-time in Israel. Doc. 80-1.  The U.S. District Court for the Western District of Texas, in transferring Mr. Herschmann's motion to quash to this District, held that: "[Eric] Herschmann and [Orly] Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time." *See Genger v. Genger*, W.D. Tex. Case #: 1:19-mc-00366-LY, Doc. 11 (p. 5 of 6).

## ARGUMENT

### I.    GOVERNING LAW

"[A] federal court may exercise ancillary jurisdiction … to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quoting *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 379-80 (1994)).   "The enforcement jurisdiction at issue in this case is distinct from ancillary jurisdiction premised on factual interdependence and is meant to ensure that a federal court will have the power to see its judgments executed, regardless of whether it would be efficient for the federal court to do so."  *Epperson v. Entertainment Express, Inc.,* 242 F.3d 100, 107 (2d Cir. 2001).  "Where the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the assets are found in the hands of a third party." *Id.* at 106.  Thus, a District Court may set aside a fraudulent conveyance. *See Empire Lighting Fixture Co. v. Practical Lighting Fixture Co.,* 20 F.2d 295, 296 (2d Cir. 1927) (Hand, J.) ("As such it was within the ancillary jurisdiction of the District Court, regardless of the fact that there was no diversity of citizenship between the parties.").

Sagi bases this motion on Fed. R. Civ. P. 69, which provides that "proceedings supplementary to and in aid of judgment or execution ... must accord with the procedure of the state where the court is located."  In New York, such procedures are set forth in Article 52 to the CPLR ("Enforcement of Money Judgments"). *See also Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984) ("Those courts which have considered the issue have determined that state law also determines the type of property which can be subject to execution.").

CPLR 5201(a)-(b) provides that a money judgment may be enforced against: (a) "any debt, which is past due or which is yet to become due…, whether it was incurred within or without the

state, to or from a resident or non-resident, unless it is exempt from application to the satisfaction of the judgment; and (b) "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment."  CPLR 5201(c)(4), in turn, provides that: "Where  property or a debt is evidenced by a negotiable instrument for the payment of money, … the instrument … shall be treated as property capable of delivery and the person holding it shall be the garnishee."  *See also* CPLR 5205 and 5206 (property exemptions).

CPLR 5225(b) provides the procedural mechanism by which a judgment creditor may collect against a garnishee or transferee:

> Upon a special proceeding[4] commenced by the judgment creditor, against <u>a person in possession or custody of money or other personal property in which the judgment debtor has an interest</u>, or against <u>a person who is a transferee of money or other personal property from the judgment debtor</u>,  where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so  paid is insufficient  to  satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to  satisfy the judgment, to a designated sheriff.  …  (Emphases added.)

*See also* CPLR 5227 (comparable special proceeding against "any person who it is shown is or will become indebted to the judgment debtor").

"'[S]uperior' rights in property have been assessed by the New York courts based on legal interests in the property, as for example where the 'fraudulent conveyance provisions of the [New York] Debtor and Creditor Law' apply." *Dussault v. Republic of Argentina*, 2015

---

[4]     A CPLR "special proceeding" is undertaken in federal court where a plaintiff proceeds by motion against a third party holding the judgment debtor's assets, provided the court has personal jurisdiction over the garnishee/transferee. *See CSX Transp., Inc. v. Island Rail Terminal, Inc.,* 879 F.3d 462, 469 (2d Cir. 2018) ("a party seeking a money judgment against a non-party garnishee may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee").  Here, Mr. Bowen works and lives in New York, Arie maintains an office in New York, and Tedco is headquartered in New York.

U.S. App. Lexis 17593, *4 (2d Cir. Oct. 5, 2015) (quoting *Gelbard v. Esses*, 96 A.D.2d 573 (2d Dep't 1983)).  Under New York law, a party may allege a fraudulent-conveyance claim within a turnover action brought under CPLR 5225. *See Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 82 (2d Cir. 2017) ("CPLR 5225 may serve as the means to set aside a transfer made by a judgment debtor to defraud his creditors.") (citation omitted); *Mitchell v. Lyons Prof'l Servs., Inc.*, 109 F. Supp.3d 555, 563 (E.D.N.Y.) ("What C.P.L.R. §§ 5225 and 5227 provide, in contrast to a plenary action, is a procedural mechanism for attacking a fraudulent conveyance ..., colloquially known as 'turnover proceedings.'"), *aff'd* 819 F.3d 636, 620 (2d Cir. 2016) (CPLR 5225 is a "mechanism for avoiding a fraudulent transfer in New York")).

"A fraudulent conveyance is void under the New York statute, and may be disregarded, even by a creditor whose judgment is entered afterwards. … It clears the title of the creditor in limine, and is in aid of the principal purpose of the suit; it 'is in substance an equitable execution.'" *Empire Lighting,* 20 F.2d at 296-97 (citations omitted).  Specifically, Section 278 of N.Y. Debtor and Creditor Law (DCL) entitles a judgment creditor to either: "(a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or (b) Disregard the conveyance and attach or levy execution upon the property conveyed." *Accord Schwartz v. A. J. Armstrong Co.*, 179 F.2d 766, 767 (2d Cir. 1950) (quoting DCL 278(1)(b)).

In this application, Sagi is invoking the following four DCL provisions:

**§ 273.  Conveyances by insolvent.** Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

**§ 273-a.  Conveyances by defendants.** Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

§ 275.  **Conveyances by a person about to incur debts.** Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

§ 276.  **Conveyance made with intent to defraud.** Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

We address each of these provisions in the section below.

## II.    THE FRAUDULENT TRANSFERS

As noted above, under New York law, a judgment creditor need not bring a plenary action in order to set aside fraudulent conveyances and obtains satisfaction of its judgment.  Rather, CPLR 5225 "obviate[s] the need for a plenary action. ... This special 'turnover' proceeding is ... sufficient to resolve the parties' rights in the disputed property." *Kashi v. Gratsos*, 712 F. Supp. 23, 26-27 (S.D.N.Y. 1989).  To invoke CPLR 5225(b), a judgment creditor must show <u>either</u> "that the judgment debtor is "entitled to the possession of such property," <u>or</u> that "the judgment creditor's rights to the property are superior" to that of the party in possession. *Beauvais v. Allegiance Sec., Inc.,* 942 F.2d 838, 840 (2d Cir. 1991).  A judgment creditor's rights are automatically superior to a party who has taken the asset by fraudulent transfer. *Dussault, supra.*

In this case, the Court has already conclusively determined, in its summary judgment rulings in *Genger I* and then again in this case*,* that the $32.3 million is property of the judgment debtor: "Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million …. Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. … Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million." *Genger I*, 76 F. Supp.3d at 491, 501.

On appeal, Orly tried to argue that the property was not actually hers, because she diverted the money to her father and her father's lenders, the Brosers (she conveniently omitted the ███ ██████████████ diverted to her husband). The Court of Appeals rejected that argument, holding that "Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie, or to pay debts owed to her litigation partners." *Genger II*, 663 Fed. Appx. at 49-50. Then in the current action, the Court reaffirmed its prior finding "that Orly had monetized her beneficial interest for $32.3 million …." Doc. 101 pp. 4, 15. Orly is bound by those determinations by *res judicata*, collateral estoppel and law of the case.

The same is true for the above-named transferees. It is a longstanding principle that "one who ... assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly, to the knowledge of the opposing party, is as much bound by the judgment, and as fully entitled to avail himself of it, as an estoppel against an adversary party, as he would be if he had been a party to the record." *Souffront v. La Compagnie Des Sucreries De Porto Rico*, 217 U.S. 475, 487 (1910). "Privity may also be found where a party not previously named in litigation nonetheless controlled and financed the defense of the suit." *Melwani v. Jain*, 2004 U.S. Dist. Lexis 16867, *5 (S.D.N.Y. Aug. 24, 2004) (emphasis added) (citing *Alpert's Newspaper Delivery v. New York Times*, 876 F.2d 266, 270 (2d Cir. 1989) (holding that sufficient identity of interests existed for *res judicata* purposes where non-party was "mastermind" of litigations by providing tactical and financial support to both)). The fact that the parties in the prior and current suits had the same attorney is also of "singular significance" in the privity analysis. *Ruiz v. Comm'r of the Dep't of Transp.*, 858 F.2d 898, 903 (2d Cir. 1988).

Here, Arie Genger and Eric Herschmann have openly funded and colluded in Orly's litigation strategy. ██████████████████████████████████—using money borrowed from the Brosers with their knowledge and consent (Exh. E at 23:15-20)—███████

████████████████████████████   ████████████████████████████

██████████████████████████████████████with his own firm serving as defense counsel.[5]   Mr.

Herschmann and Kasowitz are also representing Arie in the related state court action.  Exh. M.

And, to show how intertwined these parties all are, before David Broser's deposition, Arie asked

Mr. Broser to first speak with Mr. Herschmann.  Exh. D at 48:4-49:19.

Indeed, throughout the many Genger family litigations, including this one, Arie's and

Orly's lawyers have been all but interchangeable.  When Sagi subpoenaed the Zeichner firm for

its communications with Arie, they refused to produce or even log them, claiming a "common

interest privilege."  Exh. F.   █████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████Exh. S.  Meanwhile, when Sagi was

deposed concerning the 2004 Promise and Indemnity, *Arie's* attorney (Lauren Wachtler) handled

much of the questioning. Case 1:14-cv-05683, Doc. 33-1.

In recognition of this family dynamic, this Court prefaced its summary judgment decision

in *Genger II* by noting that the case was the latest in "a seemingly never-ending series of lawsuits

stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch,

respectively." *Genger I*, 76 F. Supp.3d at 391.  Having openly funded, assisted, and exercised a

degree of control over Orly's defense, Arie cannot now disavow the result.  Exh. EE at 100:6-

101:24.  Nor can Orly's husband, who picked up the mantle from Arie, nor can the Brosers, who

---

[5]     Herschmann himself acted as Orly's lead counsel in the prior action before Judge Forrest (Case 1:14-cv-05683, Doc. 106), and he initially appeared at a hearing in this case and introduced himself as "Eric Herschmann on behalf of Orly Genger." Exh. C at 45:17-18  Subsequently, however, his partner at Kasowitz notified the Court that Mr. Herschmann wished to retroactively change his appearance as one on his own behalf as the husband of the judgment debtor. Doc. 168.

financed the prior suit. Even if they could relitigate this Court's prior findings, it would not change the result, because this Court was correct—only Orly had live claims to settle. Thus, all $32.3 million in settlement value is attributable to her claims.

As such, the transfer of $17.3 million in July 2013 from Orly to Tedco must be set aside. This is a textbook example of DCL 275—a "conveyance made … without fair consideration <u>when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature</u>." Thus, it is "fraudulent as to both present and future creditors." *Id.* Orly was well aware, when she made that transfer, that Dalia (through Sagi) had a claim on a portion of those proceeds. Just seven months later, Orly told this Court that if the 2004 Indemnity were upheld, Orly would face for "a future demand that Orly pay Sagi $6.5 million in purported indemnification." Case 1:14-cv-1006, Doc. 11 p. 2.

Nor can there be any contention of "fair consideration." All parties agree that Orly did not owe the Brosers or any of their entities a single dollar. Exh. D at 36:9-10 ("Q: Was Orly Genger a borrower from you? David Broser: No."). As the Second Circuit explained in *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995): "Under DCL § 272, 'fair consideration' means a fair equivalent that the debtor receives in exchange for its property or obligation. Thus, when a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property." It is true that, sometimes, "the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction." But here, all parties maintain that Orly received *no* benefit from transferring her $17.3 million in settlement proceeds to the Brosers—██████████████████████████████████.

The same holds true for the UCC liens placed on Orly's assets by Arie and Mr. Herschmann. Under DCL 270, a "conveyance" includes "the creation of any lien or incumbrance,"

which means it, too, must be for fair consideration.

Neither lien was.  Starting with Arie's, purportedly in support of his ███ million note, under DCL 273-a a transfer is presumed fraudulent, without evidence of actual intend required, where it is shown: "(1) that the conveyance was made without fair consideration; (2) that the conveyor is a defendant in an action for money damages or that a judgment in such action has been docketed against him; and (3) that the defendant has failed to satisfy the judgment." *Mitchell v. Garrison Protective Servs., Inc.,* 579 F. App'x 18, 21 (2d Cir. 2014) (quoting *Grace v. Bank Leumi Trust Co. of N.Y.,* 443 F.3d 180, 188 (2d Cir. 2006)).  The latter two points are not in dispute.  Arie filed his UCC liens in August 2018, after Sagi prevailed on summary judgment in this case, and Orly has not yet paid the judgment, nor does she plan to do so.

As for "fair consideration," given Arie's litigation position that Orly is entitled to *none* of the $32.3 million, there is no conceivable value Orly obtained from Arie's funding of her state court suit.  Rather, Arie funded a litigation in *Orly's* name to pay off *Arie's* creditors.  That is not fair consideration to Orly by any stretch of the imagination.

Even if Orly had kept the settlement proceeds for her own use, that might only mean that a portion of the promissory note was for fair consideration.  But the grant of the security interest would still be a fraudulent interest, as it was almost entirely for <u>past</u> consideration, ████████ ████████████████████████████████████████████████████████████ ████████████████.  "Intra-family transfers in consideration of past consideration … require[e] very clear proof in favor of the transferee." *Arnold v. Walsh (In re Walsh),* 2006 Bankr. Lexis 5026, * 4 (Bankr. W.D.N.Y. 2006) (quoting *In re Wallace v. Kotowski (In re Dziadosz),* 1997 Bankr. Lexis 2362 (Bankr. W.D.N.Y. June 23, 1997)).  ████████████████████████████████████████ ████████████████████████████████ Exh. T.  Indeed, no one can produce a single email or transmittal letter making reference to any of those supposed earlier notes.  There is

good reason to believe they never existed.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Exh. CC.   Nor would

Arie have had any reason to record those sums, as he borrowed the money for Orly's lawyers from

the Brosers, *and then paid the Brosers back*.  In sum, he retroactively recreated a "debt," *nunc pro*

*tunc*, when Orly's liability on the 2004 Indemnity became clear.

The note in favor of Mr. Herschmann reflects a similar recharacterization of past events.

As noted above, Mr. Herschmann originally represented that those legal services were "pro bono,"

only to reclassify his invoices as "secured debt" once Sagi's claim emerged on the horizon.

Transfers like these are <u>exactly</u> why intra-family transfers are suspect.  Here, DCL 273 clearly has

been violated, as Orly admits to being rendered insolvent, claiming she will have go bankrupt if

the judgment in this case is affirmed on appeal. Doc. 123.  Absent the ████████ promissory note,

she would have been able to pay most of Sagi's judgment from the $15 million.

Lastly, regardless of any alleged adequacy of consideration, all these transfers are

fraudulent under DCL 276, in that they were all "incurred with actual intent, as distinguished from

intent presumed in law, to hinder, delay, or defraud either present or future creditors." *See Kittay*

*v. Korff (In re Palermo)*, 2011 U.S. Dist. Lexis 99537, *13 (Bankr. S.D.N.Y. Sept. 2, 2011) ("Even

where there is a fair exchange of value ..., the conveyance may be set aside if good faith is

lacking.") (quoting *In re Fill*, 82 B.R. 200, 216 (S.D.N.Y. 1987)).

Under DCL 276, a creditor is "not required to establish actual intent 'to hinder, delay, or

defraud … present or future creditors' by direct evidence, which is rarely available." *Hassett v.*

*Goetzmann*, 10 F. Supp.2d 181, 188 (N.D.N.Y. 1998).  "Rarely, if ever, is actual intent susceptible

to direct proof." *In re Fill*, 82 B.R. at 220 (citing *Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574,

1582 (2d Cir. 1983)).  Rather, intent "is generally established by inference from the circumstances surrounding the alleged fraudulent transfer." *In re Fill*, 82 B.R. at 220 (citing *ACLI Government Securities, Inc. v. Rhoades*, 653 F. Supp. 1388, 1394 (S.D.N.Y. 1987)).  These circumstances— the so-called "badges of fraud"—include: "(1) a close relationship among the parties to the transaction; (2) secrecy and haste of the sale; (3) inadequacy of consideration; and (4) transferor's knowledge of the creditor's claim and his own inability to pay it." *Rhoades, supra*; *accord Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582 (2d Cir. 1983).

"[T]he financial condition of the party . . . both before and after the transaction in question," "the existence or cumulative effect of a pattern or series of transaction or course of conduct after the incurring of debt," or "the general chronology of the events and transactions under inquiry" may also indicate fraud.  *Salomon v. Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983).  While the presence or absence of any particular badges of fraud is not dispositive, "the presence of multiple indicia will increase the strength of the inference." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 935 (S.D.N.Y. 1995).  And of particular significance here, "<u>transfers among family members raise special concerns, and receive different scrutiny</u>." *Perrone v. Amato*, 2010 U.S. Dist. Lexis 148202, *33 (E.D.N.Y. Aug. 30, 2010) (citing *In re Jacobs*, 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008) (emphasis added)).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ Exh. X at 80:5-7.  This is about as close to direct evidence of actual intent to defraud as any fraudulent conveyance action ever has seen.  Thus, there is no need for the Court to even go through a "badges of fraud" analysis.  Nevertheless, the aforementioned "badges of fraud" exist here in spades.

The decision in *Hassett, supra,* is instructive.  In that case, a judgment creditor filed suit

against the judgment debtor under DCL 276, seeking to asset aside more than $5 million in asset transfers the debtor had made to his wife and son. 10 F. Supp.2d at 185.  The District Court found the conveyances to be fraudulent, based on the "badges of fraud," including the intra-family nature of the transactions, the fact that the transfers were made at a time when the debtor was aware of potential problems with his creditors, and the fact that the transfers were rendered for inadequate consideration. *Id.* at 189.  The court also took into account the judgment debtor's retention of the possession, benefit, and use of the assets he had transferred to his wife and son, which further illustrated intent. *Id.* For instance, the judgment debtor continued to reside at the marital estate, and continued to derive substantial benefit from the transfer. *Id.; accord, e.g., Aaron v. Mattikow*, 225 F.R.D. 407, 413-14 (E.D.N.Y. Dec. 16, 2004).

The facts here are strikingly similar to those of *Hassett*.  The judgment debtor, Orly, at a time well after she had acknowledged to this Court the multi-million scope of her liability under the 2004 Indemnity, entered into a series of transactions with her husband and father to dissipate her most meaningful asset—her $15 million receivable under the 2013 Settlement Agreement—while still maintaining the benefit thereof through her husband (who funds Orly's lavish lifestyle) and father (who pledged all of his assets back to Orly's husband).  Further, as noted above, ███ ████████████████████████████████████████████████████████ ███████████████████████████████████.  As a consequence, Orly now claims to be on the verge of filing for bankruptcy.

As noted above, if actual intent is proven, the court may set aside conveyance "regardless of the adequacy of consideration given." *In re Sharp Int'l Corp.,* 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted).  For this reason as well, the transfers should be set aside.

Lastly, attorney's fees should be awarded by operation of statute.  Specifically, DCL 276-a provides in relevant part that:

> In an action or special proceeding brought by a creditor … to set aside a conveyance by a debtor, <u>where such conveyance is found to have been made by the debtor and received by the transferee with actual intent</u>, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor … shall recover judgment, the justice … presiding at the trial shall fix the reasonable attorney's fees of the creditor … in such action or special proceeding, and the creditor … shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment. … (Emphasis added.)

As noted above, actual intent is established here, both as to the transferor (Orly) and the transferees (Arie, Mr. Herschmann, and the Brosers and their entities).

Sagi therefore respectfully requests that the matter be set for an inquest on the amount of his reasonable attorney's fees and disbursements. *See, e.g., Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp.3d 598, 622 (S.D.N.Y. 2018) (awarding attorney's fees under DCL 276-a where evidence established "by clear and convincing evidence that the Home and Brooklyn Property were conveyed … with the intent to defraud 'present or future creditors'"); *see also Kittay,* 2011 U.S. Dist. Lexis 99537, *73 ("While New York DCL § 276-a does not expressly provide for an award of disbursements, they are regularly granted in this Court, to which the Defendant removed this action. As such, the Trustee's claim for disbursements is also granted.").

## CONCLUSION

Accordingly, Sagi respectfully requests that the Court grant this motion in all respects.

Dated: New York, New York
      June 11, 2019

KELLEY DRYE & WARREN LLP

*/s/ John Dellaportas*

_____
John Dellaportas
101 Park Avenue
New York, New York 10178
(212) 808-7800
*Attorneys for Defendant/Third-Party
Plaintiff and Judgment Creditor Sagi Genger*